# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

SECULAR STUDENT ALLIANCE and
DECLAN A. GALLI,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF EDUCATION
and SECRETARY OF EDUCATION,

        Defendants.

Case No. 1:21-cv-169-ABJ

# COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................. ii

Introduction............................................................................1

Background ............................................................................2

Argument............................................................................ 10

I.   The Rule is *ultra vires*............................................... 12

II.  The Rule exceeded the Department's statutory authority and
     jurisdiction, violating APA § 706(2)(C). ................................. 18

Conclusion ......................................................................... 19

# TABLE OF AUTHORITIES

**Cases***                                                             **Page(s)**

*Adamski v. McHugh,*
  304 F. Supp. 3d 227 (D.D.C. 2015) ................................................................ 12, 18

*Aid Ass'n for Lutherans v.*
  *U.S. Postal Service,*
  321 F.3d 1166 (D.C. Cir. 2003) ..................................................................... 12, 17

*Air Alliance Houston v. EPA,*
  906 F.3d 1049 (D.C. Cir. 2018) ............................................................................ 17

*Alphapointe v. Department of Veterans Affairs,*
  475 F. Supp. 3d 1 (D.D.C. 2020) ......................................................................... 11

*American Bankers Ass'n v.*
  *National Credit Union Administration,*
  271 F.3d 262 (D.C. Cir. 2001) .............................................................................. 11

*American Petroleum Institute v. EPA,*
  52 F.3d 1113 (D.C. Cir. 1995) .............................................................................. 18

*Board of Regents of University*
  *of Wisconsin System v. Southworth,*
  529 U.S. 217 (2000) ............................................................................................. 10

*Bowen v. Georgetown University Hospital,*
  488 U.S. 204 (1988) ............................................................................................. 18

*California Independent Systems*
  *Operator Corp. v. FERC,*
  372 F.3d 395 (D.C. Cir. 2004) .............................................................................. 18

*Chevron, USA v. Natural Resources Defense Council,*
  467 U.S. 837 (1984) ............................................................................................. 19

*City & County of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ......................................................................... 14, 15

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ............................................................................................. 19

*City of Los Angeles v. Barr,*
  941 F.3d 931 (9th Cir. 2019) ............................................................................... 12

---

\* Cases primarily relied upon are marked with an asterisk.

# TABLE OF AUTHORITIES—continued

**Page(s)**

*City of Philadelphia v. Attorney General,*
   916 F.3d 276 (3d Cir. 2019) .................................................................. 12

*\*Colorado River Indian Tribes
   v. National Indian Gaming Commission,*
   466 F.3d 134 (D.C. Cir. 2006) .................................................... 16, 17, 18

*Dart v. United States,*
   848 F.2d 217 (D.C. Cir. 1988) ............................................................... 12

*Haynes v. District of Columbia Water & Sewer Authority,*
   924 F.3d 519 (D.C. Cir. 2019) ............................................................... 10

*Hotel 71 Mezz Lender LLC v.
   National Retirement Fund,*
   778 F.3d 593 (7th Cir. 2015) ................................................................. 11

*Humphreys v. Roche Biomedical Laboratories, Inc.,*
   990 F.2d 1078 (8th Cir. 1993) ............................................................... 11

*Independent Meat Packers Ass'n v. Butz,*
   526 F.2d 228 (8th Cir. 1975) ................................................................. 15

*Lederman v. United States,*
   89 F. Supp. 2d 29 (D.D.C. 2000) ........................................................... 10

*\*Louisiana Public Service Commission v. FCC,*
   476 U.S. 355 (1986) .............................................................................. 12

*March for Life v. Burwell,*
   128 F. Supp. 3d 116 (D.D.C. 2015) ....................................................... 10

*\*Michigan v. EPA,*
   268 F.3d 1075 (D.C. Cir. 2001) ............................................................. 12

*\*NAACP v. DeVos,*
   No. 20-cv-1996 (DLF), __ F. Supp. 3d __,
   2020 WL 5291406 (D.D.C., Sep. 4, 2020) ................................... 16, 17, 18

*Natural Resources Defense Council v.
   National Highway Traffic Safety Administration,*
   894 F.3d 95 (2d Cir. 2018) ............................................................... 18, 19

*New York v. Department
   of Health & Human Services.,*
   414 F. Supp. 3d 475 (S.D.N.Y. 2019),
   *appeal docketed*, No. 20-31 (2d Cir. Jan. 3, 2020) .............................. 16

iii

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Orion Reserves Ltd. Partnership v. Salazar,*
   553 F.3d 697 (D.C. Cir. 2009)..................................................................... 17

*Pharmaceutical Research & Manufacturers of America*
   *v. Department of Health & Human Services,*
   43 F. Supp. 3d 28 (D.D.C. 2014)........................................................ 17, 19

*Printz v. United States,*
   521 U.S. 898 (1997) ..................................................................................... 13

*Rosenberger v. Rector & Visitors*
   *of University of Virginia,*
   515 U.S. 819 (1995) ..................................................................................... 10

*Tabor v. Joint Board for Enrollment of Actuaries,*
   566 F.2d 705 (D.C. Cir. 1977)............................................................. 18, 19

*Washington v. DeVos,*
   481 F. Supp. 3d 1184 (W.D. Wash. 2020) .................................. 16, 17, 18

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ..................................................................................... 15

**Statutes, Executive Orders, Rules, and Regulatory Materials**

5 U.S.C. § 553.................................................................................................. 18

5 U.S.C. § 706................................................................................... 17, 18, 19

20 U.S.C. § 1221e-3........................................................................................ 15

20 U.S.C. § 1681, *et seq.*............................................................................ 2, 13

20 U.S.C. § 3474....................................................................................... 15, 16

29 U.S.C. § 794(a) ..................................................................................... 3, 13

42 U.S.C. § 2000, *et seq.*......................................................................... 2, 4, 13

42 U.S.C. § 6102, *et seq.*........................................................................... 2, 13

42 U.S.C. § 12132, *et seq.*......................................................................... 3, 13

Executive Order 13,864 (Mar. 21, 2019) ................................................... 14

28 C.F.R. § 35.190 ..................................................................................... 3, 13

34 C.F.R. § 75, *et seq.*........................................................................... 2, 5, 19

## TABLE OF AUTHORITIES—continued

**Page(s)**

34 C.F.R. § 76, *et seq.* ................................................................. 2, 5, 19

85 Fed. Reg. 3,190 ........................................................................ 5

85 Fed. Reg. 59,916 ..................................................................... 1, 5

Fed. R. Civ. P. 56 ......................................................................... 10, 11

Dear Colleague Letter (October 26, 2010), https://bit.ly/3nmteI5 ......... 4, 14

Dear Colleague Letter: Title VI and Title IX Religious Discrimination
   in Schools and Colleges (Sept. 13, 2004), http://bit.ly/2XifJ1E .......... 3, 4, 14

OCR, Case Processing Manual (Aug. 26, 2020) .................................. 3, 13

Memorandum from Rod Paige, Sec'y, Dep't of Educ.,
   to Assistant Sec'y for Civ. Rts., Dep't of Educ. (Apr. 14, 2004) ............ 3

U.S. Dep't of Educ., *OCR: Religious Discrimination*,
   http://bit.ly/2Xpn0MV (last modified Dec. 4, 2020) .......................... 3, 4

**Miscellaneous**

115th Cong., HR 4508 (2018) ......................................................... 14

California Polytechnic State University, Campus Administrative
   Policies, § 620, https://bit.ly/3nK4gm1 ........................................ 8

Oregon State University, *Discrimination: Assistance to Organizations*,
   https://bit.ly/3qq3jkJ .............................................................. 7

University of West Florida, *Student Organizations: Discrimination
   Policy*, https://bit.ly/3oJV5n3 ................................................... 7

University of West Florida, *Tuition and Fees, Fines and Penalties*,
   https://bit.ly/2LHdjXV ............................................................. 9

*Two Decades of Change in Federal and State Higher Education
   Funding*, Pew Trusts, http://bit.ly/38oxjam (Oct. 15, 2019) ................ 6

Oregon State University, *Frequently Asked Questions, Why Can't I Opt
   Out of Any Student Fees?*, http://bit.ly/2XLjm0h .............................. 9

## INTRODUCTION

Colleges and universities have a critical interest in ensuring that their campuses remain inclusive and welcoming places of learning for their students. Nondiscrimination requirements serve that end, and they help to secure equal and full access to educational opportunities for all students. For these reasons, many colleges and universities, public and private alike, proudly implement generally applicable nondiscrimination requirements to create a positive and inclusive school climate for everyone. And the institutions and their students are better off for it.

Sadly, the U.S. Department of Education and its former Secretary, Betsy DeVos, apparently disagree with those aims. They enacted a new Rule (85 Fed. Reg. 59,916 (Sep. 23, 2020) (codified at 34 C.F.R. pts. 75, 76)) prohibiting public colleges and universities from applying most if not all nondiscrimination policies to religious student organizations, on pain of losing federal funding.

Under the guise of enforcing the First Amendment, the Rule bars public colleges and universities from requiring religious student organizations to comply with nondiscrimination requirements, including university rules and state laws specifying that university-recognized, university-funded student organizations may not bar students from club membership on the basis of characteristics such as race, religion, sex, sexual orientation, gender identity, disability, or status as a veteran.

But Congress has never given the Secretary *any* power to enforce the First Amendment. And the Department knows that: Time and again, it has expressly recognized that it has no authority to enforce that Amendment. Yet without even passing mention of this long-recognized limitation on the Secretary's authority, the

1

Department has now arrogated to itself the immense power to deprive public colleges and universities of federal funding unless they comply with the Secretary's interpretations of the Constitution. Allowing this Rule would render the limits on agency authority illusory.

Accordingly, Plaintiffs seek partial summary judgment on their claims that the Rule's additions of a new subsection (d) to 34 C.F.R. §§ 75.500 and 76.500 are *ultra vires* and violate the Administrative Procedure Act by exceeding the Department's statutory authority and jurisdiction.

## BACKGROUND

### A.  The Secretary's circumscribed rulemaking authority

The Department of Education provides federal financial assistance to colleges and universities through Direct Grant Programs (*see* 34 C.F.R. § 75.1, *et seq.*) and federally funded, State-Administered Programs (*see* 34 C.F.R. § 76.1, *et seq.*). As an executive agency that provides federal funding, the Department has received delegations from Congress to implement and enforce a variety of federal statutes, including certain federal civil-rights laws that use Congress's spending power to bar discrimination against members of protected classes by recipients of federal funds.

Specifically, the Secretary has received explicit delegations of statutory authority to withhold grant dollars as a means to enforce against colleges and universities the federal statutes barring federally funded discrimination on the basis of race, ethnicity, national origin, sex, age, and disability.[1] And the Secretary has in

---

[1]    *See* Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d, 2000d-1 (race, ethnicity, and national origin); Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–82 (sex); Age Discrimination in Employment Act, 42 U.S.C. §§ 6102,

turn delegated this enforcement authority to the Department's Office for Civil Rights. *See* Memorandum from Rod Paige, Sec'y, Dep't of Educ., to Assistant Sec'y for Civ. Rts., Dep't of Educ. (Apr. 14, 2004), Gouzoules Decl. Ex. A.

In exercising this authority, OCR has long and consistently recognized that Congress has never conferred on the Department any authority to enforce the First Amendment, and that the agency does not have that power.

For example, OCR's Case Processing Manual, which governs the processing of complaints and the administrative processes and procedures for terminating federal financial assistance, straightforwardly declares that while the First Amendment binds the agency itself, so that the Department must in its own actions comply with the Amendment's restrictions on governmental authority, "OCR does not have jurisdiction to enforce the First Amendment." OCR, Case Processing Manual, § 109 (Aug. 26, 2020).

Additionally, OCR issued guidance in 2004 to explain that while the Department enforces prohibitions against discrimination based on statutorily defined protected classes, which may at times overlap with religious discrimination, "OCR's jurisdiction does not extend to religious discrimination." *See* Dear Colleague Letter: Title VI and Title IX Religious Discrimination in Schools and Colleges (Sept. 13, 2004), http://bit.ly/2XifJ1E; *see also* U.S. Dep't of Educ., *OCR: Religious Discrimination*,

---

6103(a) (age); Rehabilitation Act § 504, 29 U.S.C. § 794(a) (disability); *see also* Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132–34; 28 C.F.R. § 35.190(b)(2) (delegating Attorney General's statutory authority under ADA Title II to Secretary of Education).

http://bit.ly/2Xpn0MV (last modified Dec. 4, 2020) (explaining that "[n]one of the laws that OCR enforces expressly address religious discrimination.").

That 2004 Dear Colleague Letter goes on to explain that "[o]ther agencies, including the United States Department of Justice, ensure compliance with federal laws prohibiting discrimination on the basis of religion." *Id.* Thus, for example, Title IV of the Civil Rights Act bars religious discrimination in education. *See* 42 U.S.C. § 2000c-6. As the Department explained in another Dear Colleague Letter in 2010, the Department of Justice has sole enforcement authority over Title IV's prohibitions against religious discrimination in education. *See* Dear Colleague Letter at 2 n.7 (October 26, 2010), https://bit.ly/3nmteI5. Similarly, Title VII bars religious discrimination in employment (*see* 42 U.S.C. § 2000e-2), including at educational institutions; and the Department of Justice and the federal Equal Employment Opportunity Commission have concurrent enforcement authority under Title VII (*see* 42 U.S.C. §§ 2000e-6, 2000e-5). The Department of Education has *no* enforcement authority under that section either.

Congress, in other words, carefully delineated the Secretary of Education's rulemaking and regulatory-enforcement authority, expressly defining the federal requirements that the Department may enforce through the withholding of federal funds. And the Department, in turn, has expressly and repeatedly recognized that this authority does not extend to any other types of statutory discrimination claims, much less does it constitute roving authority for the Secretary to interpret and enforce the First Amendment or the Secretary's own opinions about what constitutes religious discrimination.

### B.  The challenged Rule

In January 2020, the Department issued a notice of proposed rulemaking, stating the Department's aim to enforce the First Amendment and "prohibit discrimination on the basis of religion by requiring public institutions that receive Federal research or education grants . . . to treat religious and nonreligious student organizations the same." *See* 85 Fed. Reg. 3190, 3214 (proposed Jan. 17, 2020). And in September, the agency published its final Rule (85 Fed. Reg. at 59,916), which became effective on November 23. The Rule now requires "public institutions of higher education that receive a Direct Grant or subgrant from a State-Administered Formula grant program of the Department to comply with the First Amendment, as a material condition of the grant." *Id.* at 59,918 (codified at 34 C.F.R. §§ 75.500(b)(1), 76.500(b)(1)); *see also id.* at 59,979–80. That means the Department now requires recipients of federal funds to comply with the First Amendment (and the Secretary's interpretations thereof), on pain of losing federal funding. It does so in two ways.

First, the Rule provides that if a court finds in a final, nondefault judgment that a public college or university violated the First Amendment, the college is also subject to punishment by the Department through loss of all federal grant funds. *See* 85 Fed. Reg. at 59,979–80.

Second, and also under the guise of enforcing the First Amendment, the Rule regulates public colleges' and universities' application of their nondiscrimination policies to student organizations. Specifically, the Rule amends 34 C.F.R. § 75.500 and § 76.500, which govern nondiscrimination requirements in the Department's Direct Grant Programs and State-Administered Programs, by adding a new

subsection (d) to each section, to require that, as "a material condition of the Department's grant[s]," the schools:

> shall not deny to any student organization whose stated mission is religious in nature and that is at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution (including but not limited to full access to the facilities of the public institution, distribution of student fee funds, and official recognition of the student organization by the public institution) because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs.

85 Fed. Reg. at 59,978–80.

In other words, the Department now forbids grantees to deny official recognition or funding to religious student groups that violate university nondiscrimination policies by, for example, barring students from membership or leadership positions on the basis of their race, religion, sexual orientation, or gender identity—even when university policies require all other student groups to adhere to precisely the same nondiscrimination requirements. *See id.* The Department does so despite ostensibly seeking to ensure that universities "treat religious and nonreligious student organizations the same." *See* 85 Fed. Reg. at 3,214.

Because the Rule makes compliance with these new requirements a material condition of grants and subgrants from the Department, public colleges and universities stand to lose that funding should they continue to apply nondiscrimination policies equally to religious and nonreligious student groups alike. *See* 85 Fed. Reg. at 59,978–80. And because the Department provides tens of billions of dollars in federal funding to institutions of higher education annually—funding on which the institutions rely—the loss of the federal funding could be catastrophic for

most institutions. *See generally Two Decades of Change in Federal and State Higher Education Funding*, Pew Trusts, http://bit.ly/38oxjam (Oct. 15, 2019).

## C.  The Plaintiffs

Plaintiff Secular Student Alliance is a national nonprofit organization dedicated to advancing nonreligious viewpoints in public discourse, with affiliates and chapters that are recognized student groups at more than 95 public colleges and universities nationwide. *See* Bolling Decl. ¶¶ 3–13; Pls.' Statement of Undisputed Material Fact (Stmt.) ¶¶ 12–13. Among the public campuses where SSA's chapters are located is Oregon State University. *See* Rajeshnarayanan Decl. ¶¶ 3–4; Stmt. ¶¶ 15–21. SSA also has student members at colleges and universities without chapters, such as the University of West Florida. *See* Bass Decl. ¶¶ 1–4; Stmt. ¶¶ 23–27.

Oregon State and the University of West Florida are public universities (Stmt. ¶¶ 14, 22) that require student organizations, including SSA chapters, to comply with university nondiscrimination policies if they are to receive official recognition and official funding from the universities. Their nondiscrimination policies apply the same way to all student organizations (including SSA chapters where present), without regard to what viewpoints the groups may espouse or whether they are religious or nonreligious.[2]

---

[2]  Oregon State's policy provides that "No institution or division shall recognize, register or otherwise provide assistance to any organization that discriminates in its membership on the basis of age, disability, national origin, race, marital status, religion, sex or sexual orientation." *See* Oregon State University, *Discrimination: Assistance to Organizations*, https://bit.ly/3qq3jkJ. West Florida's policy provides that "Membership of student organizations is open to all regardless of age, color, disability, gender, gender identity, sex, sexual orientation, marital status, national origin, race[,] religion and veteran status." *See* University of West Florida, *Student Organizations: Discrimination Policy*, https://bit.ly/3oJV5n3.

SSA and its chapters welcome all students as members regardless of their identity or religious affiliation, and they value the efforts of colleges and universities to ensure inclusivity through uniform application of campus nondiscrimination policies. *See* Bolling Decl. ¶¶ 3–13; Stmt. ¶¶ 13, 19, 37. SSA's campus chapters are nonreligious organizations that, in accordance with the national organization's standards, do not require any particular viewpoint for students either to be members or to stand for election to offices leading the groups. *See* Bolling Decl. ¶¶ 3–13; Stmt. ¶¶ 13, 19, 37.

Declarant Aditya Rajeshnarayanan is a member of SSA and a student at Oregon State. *See* Rajeshnarayanan Decl. ¶¶ 1–4; Stmt. ¶¶ 17–18. In addition to being a member of the SSA affiliate at Oregon State, Aditya is a member of other student groups that must comply with the university's nondiscrimination policy. *See* Rajeshnarayanan Decl. ¶¶ 4–11; Stmt. ¶¶ 17–18. Declarant Patrick Keith Bass Jr. is a member of SSA and a student at the University of West Florida. *See* Bass Decl. ¶¶ 1–4; Stmt. ¶ 23.

Plaintiff Declan Galli is a student at California Polytechnic State University, which, like Oregon State and University of West Florida, requires student groups to comply with its nondiscrimination policy to receive university recognition and funding.[3] Stmt. ¶ 28.

---

[3]   Cal Poly requires that recognized student organizations "shall not discriminate on the basis of race, religion, political affiliation, national origin, ethnicity, color, age, gender, gender identity, marital status, citizenship, sexual orientation, or disability." *See* California Polytechnic State University, Campus Administrative Policies § 620.2, https://bit.ly/3nK4gm1.

Declan is gay, Episcopalian, and of Latinx descent. Galli Decl. ¶ 15; Stmt. ¶ 30. And he is active in recognized student organizations at Cal Poly, including the Transgender & Queer Student Union. Galli Decl. ¶¶ 11–13; Stmt. ¶ 29. He knows of incidents of anti-LGBTQ discrimination by students and others on campus (Galli Decl. ¶ 18; Stmt. ¶ 31), and he values Cal Poly's existing nondiscrimination policy, which allows him to participate fully in campus life and protects him from being forced to fund recognized student organizations that would otherwise discriminate against him based on these or other protected characteristics (Galli Decl. ¶¶ 4, 19–20; Stmt. ¶ 37).

Declan, Aditya, and Patrick are each required by their universities to pay mandatory student fees, which are automatically assessed on their tuition bills every semester. *See* Stmt. ¶¶ 16, 24, 33; Rajeshnarayanan Decl. ¶¶ 9–10; Bass Decl. ¶¶ 5–6; Galli Decl. ¶¶ 8–9. Those fees then go to fund officially recognized student organizations.[4]

As already noted, their universities have required all recognized student organizations, regardless of religious or nonreligious viewpoint, to comply with university-wide nondiscrimination policies if they are to receive official recognition and funding. But now, the U.S. Department of Education requires universities to alter or rescind their nondiscrimination policies, on threat of losing all federal grants.

When they do, Declan and SSA's student members like Aditya and Patrick will be forced to pay, through their mandatory student-activity-fund fees, to support

---

[4]   *See, e.g.*, Oregon State University, *Frequently Asked Questions, Why Can't I Opt Out of Any Student Fees?*, http://bit.ly/2XLjm0h; University of West Florida, *Tuition and Fees, Fines and Penalties*, https://bit.ly/2LHdjXV; *see also* Bass Decl. ¶ 4.

discrimination to which these students object, by official, university-funded groups that would exclude the students from membership on grounds currently forbidden by the schools' nondiscrimination policies. And the students and the campus organizations to which they belong will be denied equal access to a limited public forum based on the challenged Rule's required special preferences and privileges for religious viewpoints.[5] Alternatively, should the universities decline to change their policies, they will be subject to loss of federal grants, which will injure Declan, SSA's other student members such as Aditya and Patrick, and all students, by depriving their universities of significant resources and diminishing the offerings and resources that are in turn available to the students, adversely affecting their educations. In other words, the Rule will either force Declan and SSA's members to fund discrimination, including discrimination against themselves, or else deprive them of substantial educational opportunities. Either way, they are harmed.

## ARGUMENT

Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 523 (D.C. Cir. 2019). Summary judgment is the "appropriate method by which to resolve the merits of a

---

[5] *See generally Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229–30 (2000); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995) (holding that funding for printing costs for student-run publications was a limited public forum to which religious and nonreligious student groups must have equal access). On this consequence of the Rule, *see* Compl. ¶¶ 29–32. Plaintiffs' substantive legal claims regarding this deprivation of First Amendment rights, stated in Count III of the Complaint, are not the subject of this motion for partial summary judgment.

dispute regarding federal agency action 'because the . . . regulation's validity is a question of law.'" *March for Life v. Burwell*, 128 F. Supp. 3d 116, 124 (D.D.C. 2015) (quoting *Lederman v. United States*, 89 F. Supp. 2d 29, 33 (D.D.C. 2000)).

A party may seek partial summary judgment on one or more claims, as plaintiffs do here, while leaving other claims to be addressed, should that be necessary, at a later point in the litigation. *See, e.g.*, *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 606 (7th Cir. 2015). Because a party may move for summary judgment (or partial summary judgment) at any time up until 30 days after the close of discovery (*see* Fed. R. Civ. P. 56(b)), a summary-judgment motion may be entertained and granted before the parties undertake any discovery (*see, e.g.*, *Humphreys v. Roche Biomedical Labs., Inc.*, 990 F.2d 1078, 1081 (8th Cir. 1993)).

Because Congress has not conferred on the Secretary of Education any authority to enforce the First Amendment, the Secretary's interpretations of it, or the Secretary's own views about religious discrimination, the challenged Rule is *ultra vires*; and for the same reason, it exceeds the Department's statutory authority and jurisdiction in violation of the APA. Those claims can be decided without production of or reference to the administrative record, because they are questions of law that turn solely on the nonexistence of any Congressional delegation of authority. *Cf. Alphapointe v. Dep't of Veterans Affairs*, 475 F. Supp. 3d 1, 12 (D.D.C. 2020) (a court "does not require an administrative record[ ] where a party's assertion . . . 'can be resolved with nothing more than the statute and its legislative history'" (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266 (D.C. Cir. 2001)

(alterations omitted)). Partial summary judgment for Plaintiffs on these purely legal claims should be granted.[6]

## I.   The Rule is *ultra vires.*

An "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Thus, if "there is no statute conferring authority, a federal agency has none." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001). And when an agency has acted without authority, federal courts have "inherent power . . . 'to reestablish the limits on [executive] authority' through judicial review." *Adamski v. McHugh*, 304 F. Supp. 3d 227, 237 (D.D.C. 2015) (brackets in original) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

1. The Secretary's actions here were *ultra vires* because the Department promulgated the Rule without delegated authority from Congress. *See Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172–73 (D.C. Cir. 2003); *see also City of Los Angeles v. Barr*, 941 F.3d 931, 942 (9th Cir. 2019); *City of Philadelphia v. Att'y Gen.*, 916 F.3d 276, 288–91 (3d Cir. 2019).

---

[6]   Plaintiffs' Complaint also raises additional claims, including that the Rule is unconstitutional, contrary to law, and arbitrary and capricious because, among other reasons, the Department purports to enforce a First Amendment requirement that the Supreme Court has held does not exist; it discriminates based on viewpoint in mandating differential access to limited public forums; and it did not adequately consider the grave harms to students and their colleges and universities that the Rule inflicts. *See* Compl. ¶¶ 81–105. Those claims (which would require the administrative record under Local Rule 7(n) and potentially also other discovery) are not the subject of this motion, because partial summary judgment for Plaintiffs at this time on the claims arising from the lack of statutory authority for the Rule would afford full relief and therefore should obviate the need for the Court to decide the remaining claims.

When Congress wishes for a federal agency to enforce legal requirements, whether relating to constitutionally based interests or otherwise, it does so expressly, by defining the pertinent rights, interests, and legal duties statutorily, and then expressly authorizing an agency or agencies to enforce the resulting statutory requirements. Thus, Congress has, through the exercise of its spending power, established statutory rights to be free from federally funded discrimination on the basis of race, color, national origin, sex, age, and disability, and has formally delegated to the Secretary of Education the authority to enforce those rights by withholding federal financial assistance from colleges and universities that do not adhere to Congress's statutorily imposed requirements. *See* Title VI, 42 U.S.C. §§ 2000d, 2000d-1; Title IX, 20 U.S.C. §§ 1681–82; Rehabilitation Act § 504, 29 U.S.C. § 794(a); ADA, 42 U.S.C. §§ 12132–34 (enforcement authority delegated to the Secretary via 28 C.F.R. § 35.190(b)(2)); Age Discrimination Act of 1975, 42 U.S.C. §§ 6102, 6103(a).

As the Department's Office for Civil Rights has expressly and repeatedly acknowledged, Congress has never delegated to the Department any authority to interpret or enforce grant recipients' compliance with the First Amendment. *See, e.g.*, OCR, Case Processing Manual § 109. The challenged Rule does not identify any statute that confers that authority, and Plaintiffs are aware of none. And the First Amendment *limits* the Secretary's authority; it does not independently empower the Secretary to impose the Amendment's requirements on third parties. *Cf. Printz v. United States*, 521 U.S. 898, 937 (1997) (Thomas, J., concurring) (contrasting federal government's enumerated powers with First Amendment).

Nor has Congress conferred on the Department the authority to enforce any *statutory* rights that relate to First Amendment concerns, whether about religion or otherwise. Rather, Congress has assigned to the *Department of Justice* the authority to enforce its statutory proscription against religious discrimination in institutions of higher education. *See* Title IV, 42 U.S.C. § 2000c-6, 2000e-6; *accord* U.S. Dep't of Educ., Dear Colleague Letter: Title VI and Title IX Religious Discrimination in Schools and Colleges (Sept. 13, 2004), http://bit.ly/2XifJ1E. And hence, the Department of Education has expressly acknowledged that the authority to enforce that law resides with the Attorney General, not the Secretary of Education. *E.g.*, Dear Colleague Letter at 2 n.7 (Oct. 26, 2010), https://bit.ly/3nmteI5.

But lest any doubt remain, in 2018 Congress considered and *rejected* a bill (H.R. 4508, 115 Cong. (2018)) that would have included language virtually identical to the challenged portion of the new Rule. *Compare id.* Part B § 116, at 45, *with* 85 Fed. Reg. at 59,979. Had that bill been enacted, it presumably would have provided the statutory authority that the Secretary (then, Betsy DeVos) arrogated to herself here through administrative rulemaking. That Congress considered the bill to add this statutory authority further confirms Congress's understanding that the Secretary did not already have the authority. And that Congress chose not to enact the bill—or anything even remotely related—underscores that Congress does not intend for the Secretary to have that authority now. *Cf. City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) (considering "failed legislation" in holding that executive branch lacked power to do what Congress had "considered and thus far rejected").

The Department was obligated to respect Congress's choice and quite simply had no authority to act.

2. Lacking any valid congressional delegation of rulemaking or enforcement authority over either the First Amendment or religious discrimination, the Department points for its authority to Executive Order 13,864, 84 Fed. Reg. 11,401 (Mar. 21, 2019), and its general rulemaking powers under 20 U.S.C. § 1221e-3 and 20 U.S.C. § 3474. *See* 85 Fed. Reg. at 59,943. None confer the requisite regulatory authority.

The Executive Order does not make up for the absence of an act of Congress. For President Trump could exercise—and thus delegate—only his own independent powers, or else those that Congress had first delegated to him by statute. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring in the judgment); *Indep. Meat Packers Ass'n v. Butz*, 526 F.2d 228, 235 (8th Cir. 1975) (President may not "act as a lawmaker in the absence of a delegation of authority or mandate from Congress."). And just as Congress has not delegated to the Secretary of Education any authority to enforce the First Amendment against colleges and universities, it has not delegated that authority to the President either.

Nor does either of the cited statutes come anywhere close to being a sufficient delegation or authorization.

Section 1221e-3 authorizes the Secretary to promulgate regulations governing the programs administered by the Department, "to carry out functions otherwise vested in the Secretary by law or by delegation of authority pursuant to law, and subject to limitations as may be otherwise imposed by law." In other words, if

Congress, through some *other* statute, were to confer authority on the Department to enforce the First Amendment or a statutory provision barring religious discrimination in higher education, Section 1221e-3 might potentially help ensure that the Secretary had adequate authority to promulgate the regulations needed to enforce that other statute—subject, of course, to the scope and limits of the substantive statute and the delegation that it provided. But Section 1221e-3 necessarily depends on the existence of another, substantive statute to confer power on the agency. *See NAACP v. DeVos*, No. 20-cv-1996 (DLF), __ F. Supp. 3d __, 2020 WL 5291406, at *5–6 (D.D.C., Sep. 4, 2020); *Washington v. DeVos*, 481 F. Supp. 3d 1184, 1193 (W.D. Wash. 2020). As already explained, there is no such statute here, and the Rule points to none.

Relatedly, Section 3474 authorizes the Secretary "to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department." In other words, it authorizes the Secretary to enact rules needed to manage the internal operations and functions of the agency. *See New York v. Dep't Health & Human Servs.*, 414 F. Supp. 3d 475, 521 (S.D.N.Y. 2019), *appeal docketed*, No. 20-31 (2d Cir. Jan. 3, 2020). It is not free-floating authority to enforce against grant recipients the Secretary's views about what the First Amendment might require. *Cf. DeVos*, 2020 WL 5291406, at *5–6.

This Court recently rejected former Secretary DeVos's invocation of these same two general rulemaking powers in another attempt to impose substantive rules not authorized by Congress:

> Of course, "an agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." "Agencies are . . . bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." And neither of the general rulemaking authority provisions provides support for the Department's actions here.

*DeVos*, 2020 WL 5291406, at *6 (brackets omitted) (quoting *Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006)); *see also Washington*, 481 F. Supp. 3d at 1193. In other words, these general rulemaking powers are not explicit grants of substantive rulemaking authority; nor are they implicit grants of authority, except when Congress has specifically assigned a substantive duty to the Department and "left . . . gaps for the agency to fill" in deciding how to perform that specific duty. *DeVos*, 2020 WL 5291406, at *6.

Here, as in *DeVos*, none of that occurred. So the Department is left "grasping at its separate, more general authority," which as a matter of law is insufficient to support the enforcement authority over colleges and universities that the former Secretary arrogated to herself here. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *Colo. River*, 466 F.3d at 139 (general rulemaking authority "does not mean that [any] specific rule the agency promulgates is a valid exercise of that authority"); *accord, e.g.*, *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009).

The Department's actions are *ultra vires*, so the Rule cannot stand. *See, e.g.*, *Aid Ass'n for Lutherans*, 321 F.3d at 1175; *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 39–40 (D.D.C. 2014).

## II. The Rule exceeded the Department's statutory authority and jurisdiction, violating APA § 706(2)(C).

Under the APA, a court must "hold unlawful and set aside" any regulation that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). For the same reasons that it is *ultra vires*, the Rule also violates the APA.

The APA's prohibition against agency action in excess of statutory authority or jurisdiction and the bar on *ultra vires* agency action reflect the same fundamental principle that an agency's "power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). As a result, it is "incumbent upon" the Department to "demonstrate that some statute confers upon it the power it purport[s] to exercise." *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 398 (D.C. Cir. 2004); *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995). Indeed, when the Department issues a rule it must specifically reference on the face of that rule the statutory authority under which the Secretary is acting. *See* 5 U.S.C. § 553(b)(2). And should the Department fail to demonstrate adequate statutory authority when publishing the rule, it may not later point to other statutes as *post hoc* justifications. *See Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 709–11 (D.C. Cir. 1977); *accord Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 111 (2d Cir. 2018).

Again, the Rule fails Section 706(2)(C) for all the same reasons that it is *ultra vires*. *Cf. Adamski*, 304 F. Supp. 3d at 236–37 (APA claims of lack of statutory authority embody the same general principle as *ultra vires*). The only authorities that the Department cites in the Rule, as required by APA § 553(b)(2), and thus the only

authorities on which it may now rely (*see, e.g.*, *Tabor*, 566 F.2d at 709–10), are the Executive Order and the general rulemaking statutes described in Part I above. And as already explained, none of those provide anything remotely approaching the requisite substantive rulemaking or enforcement authority. *See* Part I, *supra*; *Colo. River*, 466 F.3d at 139; *DeVos*, 2020 WL 5291406, at *1–6; *Washington*, 481 F. Supp. 3d at 1193. Nor, as explained, does any other statute, even if the Department *could* rely on *post hoc* invocations of statutory authority under Section 706(2)(C)—which it cannot (*see Tabor*, 566 F.2d at 709–10).

Neither is the Secretary entitled to any deference here. *Cf. Chevron, USA v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984). For when an agency has merely "strung together" statutory provisions that "do not authorize" the rule in question, courts properly vacate the rule under *Chevron* step one. *See Pharm. Rsch. & Mfrs. of Am.*, 43 F. Supp. 3d at 39–40.[7]

## CONCLUSION

No statute, enumerated in the Rule or otherwise, delegates to the Department any authority or jurisdiction over educational institutions' compliance with the First Amendment or authorizes the Department to impose on them the Secretary's view of what constitutes unconstitutional religious discrimination. Hence, the Rule is *ultra vires* and also exceeds the Secretary's statutory authority and jurisdiction under the

---

[7]  What is more, the Secretary's interpretation of the First Amendment would be entitled to no deference under any circumstance, because final authority to interpret the Constitution rests with the courts, not the executive branch. *See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 519–20 (1997) (distinguishing, even for Acts of Congress, between power to enforce and power to "determine what constitutes a constitutional violation").

APA. The Court should grant Plaintiffs' motion for partial summary judgment and vacate, set aside, and enjoin enforcement of the Rule's amendments to 34 C.F.R. §§ 75.500(d) and 76.500(d).

Respectfully submitted,

/s/ *Richard B. Katskee*
Richard B. Katskee (D.C. Bar. No. 474250)
Bradley Girard (D.C. Bar. No. 1033743)
Alexander Gouzoules (D.C. Bar. No. 1697217)
   AMERICANS UNITED FOR SEPARATION OF
      CHURCH AND STATE
   1310 L Street NW, Suite 200
   Washington, DC 20005
   (202) 466-3234
   *katskee@au.org*

Alison M. Gill (D.C. Bar No. 499620)
AMERICAN ATHEISTS LEGAL CENTER
1100 15th St. NW
Fourth Floor
Washington, DC 20005

Geoffrey T. Blackwell (D.D.C. Bar No. NJ029)
AMERICAN ATHEISTS LEGAL CENTER
1201 S. Courthouse Rd. #425
Arlington, VA 22204

*Counsel for Plaintiffs*

Dated: February 23, 2021

**CERTIFICATE OF SERVICE**

I certify that on February 23, 2021, this Combined Motion for Partial Summary Judgment and Memorandum of Points and Authorities and the accompanying Statement of Undisputed Material Facts, Proposed Order, Declaration of Declan A. Galli, Declaration of Patrick K. Bass Jr., Declaration of Aditya Rajeshnarayanan, Declaration of Kevin E. Bolling, and Declaration of Alexander Gouzoules were filed using the Court's CM/ECF system, which will serve all counsel of record.

/s/ *Richard B. Katskee*
Richard B. Katskee (D.C. Bar. No. 474250)